IN THE SUPREME COURT OF MISSISSIPPI
NO. 93-CA-01139-SCT

*WANDA M. JONES AS MOTHER AND NATURAL*
*GUARDIAN OF ALEXANDER C. JONES, DITRA S.*
*COOLEY, AND DERRICK L. COOLEY, THE MINOR*
*HEIRS AT LAW OF WILLIS COOLEY, AND JIMMY*
*H. COOLEY AS ADMINISTRATOR OF THE ESTATE*
*OF WILLIS COOLEY, DECEASED*

*v.*

*JAMES REEVES CONTRACTORS, INC., HOWARD*
*INDUSTRIES, INC., AND FOIL, WYATT, &*
*MCKEWEN, P.A.*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/20/93 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | JOHN ARTHUR EAVES JR. |
| ATTORNEYS FOR APPELLEES: | JOHN MARK WEATHERS |
| | MICHAEL O. GWIN |
| | LUKE DOVE |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 3/27/97 |
| MOTION FOR REHEARING FILED: | 4/29/97 |
| MANDATE ISSUED: | 12/1/97 |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. The heirs and estate administrator of a construction worker sued the project architects, the lessee of the construction property and the general employer of a trackhoe operator. The worker and two others were killed when the walls of a ditch being excavated for a sewer line caved in, burying the workers and smothering them to death. The trial judge sustained motions for summary judgment as to all defendants and dismissed the lawsuit on the basis that (1) the trackhoe operator was the

"loaned employee" of the general contractor and thus immune from suit under the Workers Compensation statute; (2) the lessee of the construction site had breached no duty to the deceased worker; and (3) the project architects had no duty to warn the deceased worker of dangerous soil conditions. It is the opinion of the Court that the judgment of the trial court should be reversed as to the trackhoe operator and affirmed as to the project architect and the lessee of the construction site.

## FACTS

¶2. In 1988, Howard Industries (Howard) began to construct an expansion of its plant in Jones County. The expansion site had been purchased from Howard by Jones County and then leased back to Howard. The Jones County Board of Supervisors approved a bond issue to raise money for the expansion. The lease required Howard to repay all of the bond money, and gave Howard an option to repurchase the property for a *de minimis* amount upon full repayment. Jones County owned the site and was responsible for constructing the building. Howard was the authorized agent of Jones County for the purpose of completing the construction project.

¶3. Pursuant to the authority granted to it in the lease agreement, Howard selected Foil, Wyatt & McKewen (Foil-Wyatt) to perform architectural services in connection with the project. Foil-Wyatt had no general supervisory duties over the project, nor were they present on the day of the fatal accident. They simply performed the design portion of the project. McCaskill Brothers Plumbing Company, Inc. (McCaskill Brothers), the employer of the deceased Willis Cooley, was selected along with three other contractors through the public bidding process. Each contractor selected was to complete a particular portion of the project. Howard did not have possession of the premises at this time, but did maintain a project coordinator at the site to ensure that the project's four contractors complemented each other in the completion of portions of the work. McCaskill Brothers' portion was the plumbing, heating and air conditioning work, including the installation of a sewer lift station, which required the excavation of a hole approximately fifteen feet deep. John McCaskill, Jr., McCaskill Brothers' site supervisor, testified that before the fatal excavation he had noticed water in the ditches for the foundation footings. Based upon this observation, he had a well-point system installed at the construction site about one and one-half weeks before the excavation for the purpose of "dewatering" the soil. The system was supposed to pull moisture out of the excavation site, thus making the soil more compact and lessening the chance of a cave-in.

¶4. Because McCaskill Brothers did not have the heavy equipment needed for the excavation of the hole, John McCaskill, Sr., president of McCaskill Brothers, orally contracted with James Reeves, Contractor, Inc. for the use of a track backhoe (trackhoe) and an operator. James Reeves, Jr. was the person from Reeves Construction who took the call from McCaskill. Reeves testified at his deposition that McCaskill, Sr. called to ask if Reeves Construction could rent out a trackhoe for the following day for the purpose of setting a manhole. It is the practice of Reeves Construction to send an operator with the trackhoe whenever someone rents the machine. No price was discussed, neither was a specific operator requested. James Reeves, Jr. decided that he would be the operator because he was the only one in town. John McCaskill, Jr. stated that it was his understanding that McCaskill Brothers' contract was with Reeves Construction and not with James Reeves individually since the equipment was owned by the construction company.

¶5. The next morning, Reeves loaded the trackhoe onto a trailer, drove to the construction site,

unloaded it, and met with John McCaskill, Jr. McCaskill laid out the plan for the work to be done that day. McCaskill showed Reeves a rough circle he had painted on the asphalt approximating where the lift station was to be installed and instructed Reeves to dig there. McCaskill, Jr. also informed Reeves of the location of a grade beam, a water line, and the well-point system in and around the excavation to help Reeves determine where the trackhoe could be safely placed.

¶6. McCaskill, Jr. stated that the only responsibility that Reeves had at the site was to dig the hole. He did not name any further responsibilities that Reeves would have while working on the job that day and stated that it would not be Reeve's place to do tasks that he would ordinarily order his regular employees to do. He also stated that he would measure the elevation to let Reeves know when the hole was deep enough.

¶7. Reeves testified in his deposition that at one point he stopped digging because he discovered that the subsurface had a flowing stratum of what Reeves termed "watersand." Given the dangerous propensities of that type of soil, Reeves testified that he told McCaskill, Jr. about the dangerous condition. For his part John McCaskill, Jr. denies that such a conversation ever took place between himself and Reeves. Reeves also stated that he would not have gone into the hole, but it was not his place to tell Willis Cooley not to go because "he did not work for us."

¶8. McCaskill used a transit to determine the depth of the hole. At one point, Reeves lowered the manhole into the hole. McCaskill used the transit to measure the depth, and determined that the hole needed to be six to eight inches deeper. This was important because according to McCaskill, Jr., the top elevation of the manhole had to be within one inch of the existing road under which it was being placed. Reeves then removed the manhole, and dug the hole deeper. On the second attempt, the manhole was lowered into the hole. Larry Jones, a McCaskill Brothers employee went into the hole to assist in measuring the new elevation of the manhole. He was pinned at the knees to the manhole by a small clump of dirt. Willis Cooley and Jerry Kitchens, who were already in the hole, ran around and began to try to pull the dirt away from Jones's legs. At that point, the walls of the excavation caved in, burying and suffocating all three men.

¶9. It is unclear from the record whether McCaskill Brothers ever paid either James Reeves, Jr. or James Reeves, Contractor, Inc. McCaskill Brothers subsequently hired another construction company to complete the job which was understandably abandoned by Reeves after the fatal accident.

¶10. On February 6, 1992, the heirs of Willis Cooley sued James Reeves, Contractor, Inc., Howard Industries, and Foil-Wyatt, on the grounds of wrongful death and negligence. All three defendants moved for summary judgment and the plaintiffs moved for partial summary judgment as to liability against Howard and Reeves Contractor, Inc. On July 15, 1993, the trial judge entered his order sustaining the defendant's summary judgment motions and denying summary judgment to the plaintiffs. The plaintiffs now appeal.

## STANDARD OF REVIEW

¶11. This Court reviews matters involving summary judgment *de novo*. ***Townsend v. Estate of Gilbert***, 616 So. 2d 333, 335 (Miss. 1993). A *de novo* review entails reviewing all evidentiary matters in the record: affidavits, depositions, admissions, interrogatories, etc. The evidence must be viewed in the light most favorable to the nonmoving parties, and they are to be given the benefit of every

reasonable doubt. *Id.* A motion for summary judgment will lie only where there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. *Id.*

SULLIVAN, P.J., FOR THE COURT:

I.

**WHETHER THE TRIAL COURT ERRED IN HOLDING THAT JAMES REEVES, JR. WAS A LOANED SERVANT OR DUALLY EMPLOYED--THEREBY AFFORDING REEVES, INC. IMMUNITY UNDER THE WORKERS COMPENSATION ACT.**

¶12. The plaintiffs' first allegation of error is that the trial court should not have ruled that James Reeves, Jr. was a co-employee of Willis Cooley at the time of the accident under the "dual employment" or "loaned servant" doctrine. If Cooley and Reeves, Jr. were co-employees of McCaskill Brothers at the time of the accident, then Reeves Contractor, Inc. cannot be sued because it is protected under the statutory immunity granted to co-employees and employers under the Mississippi Workers Compensation Act. Miss. Code. Ann. § 71-3-1to 181 (1972). If, however, Reeves was not a co-employee of Willis Cooley at the time of the accident, then Reeves would have been acting as the agent of a third party independent contractor. James Reeves, Contractor, Inc., on whose behalf he would have acted, would be a stranger to the employment relationship between Cooley and McCaskill Brothers, and would not be statutorily immune from suit for any alleged negligence that may have stemmed from Reeves' actions in digging the hole.

¶13. The question of whether a worker is a "borrowed servant" or is an "independent contractor" at a particular time is one which has perplexed this Court and others for decades. This Court, in *Kisner v. Jackson*, 159 Miss. 424, 428-29, 132 So. 90, 91 (1931), set forth a multi-factored test to help simplify the determination of a worker's employment status. The factors included: whether the principal/master has the power to terminate the contract at will; whether he has the power to fix the price in payment for the work; whether he vitally controls the manner and time for payment; whether he furnishes the means and appliances for the work; whether he has control of the premises; whether he furnishes the materials upon which the work is done and receives the output, the contractor dealing with no other person with respect to output; whether he has the right to prescribe and furnish details of the kind and character of work to be done; whether he has the right to supervise and inspect the work during the course of the employment; whether he has the right to direct the details of the manner in which the work is to be done; whether he has the right to employ or discharge the subemployees and fix their compensation; whether he is obliged to pay the wages of said employees.

¶14. The *Kisner* Court recognized that no precise formula would work in all cases, and that the factors which it set out were not set out in any particular order of importance. 159 Miss. at 427, 132 So. at 91. The *Kisner* Court also recognized that "in any given case, it gets back to the original proposition whether in fact the contractor was actually independent, free of the will of his employer--actually and substantially free from his control." *Id*.

¶15. Twenty years later, in the case of *Carr v. Crabtree,* 212 Miss. 656, 55 So.2d 408 (1951) this Court found itself still struggling with the question of where the dividing line exists between an independent contractor and a borrowed servant. The Court stated there:

Although it is apparent from an examination of cases involving the independent contractor relationship that there is no absolute rule for determining whether one is an independent contractor or an employee, and that each case must be determined on its own facts, nevertheless, there are many well-recognized and fairly typical indicia of the status of an independent contractor, even though the presence of one or more indicia in a case is not necessarily conclusive. It has been held that the test of what determines independent service lies in the control exercised, the decisive question being as to who has the right to direct what shall be done, and when and how it shall be done. It also has been held that the commonly recognized tests of the independent contractor relationship, although not necessarily concurrent or each in and of itself controlling, are the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price, the independent nature of his business or his distinct calling, his employment of assistants with the right to supervise their activities, his obligation to furnish the necessary tools, supplies and materials, his right to control the progress of the work as to the final result, the time for which the workman is employed, the method of payment, whether by time or by job, and whether the work is part of the regular business of the employer.

212 Miss. at 666, 55 So. 2d at 411.

¶16. Yet another ten years later, in the case of *Clark v. Luther McGill, Inc.*, 240 Miss. 509, 127 So. 2d 858 (1961), the Court said:

. . . What gives the lent-employee cases their special character, however, is the fact that they begin, not with an unknown relation, but with an existing employment relation. . . . The only presumption is the continuance of the general employment which is taken for granted as the beginning of any lent-employee problem. **To overcome this presumption, it is not unreasonable to insist upon a clear demonstration that a new temporary employer has been substituted for the old, which demonstration should include a showing that a contract was made between the special employer and the employee, proof that the work being done was essentially that of the special employer, and proof that the special employer assumed the right to control details of the work**.

240 Miss. at 518, 127 So. 2d at 861 (*quoting* § 48.10, Vol.1, *Larson's Workmen's Compensation Law*)(emphasis added).

¶17. In *Quick Change Oil and Lube v. Rogers*, 663 So.2d 585 (Miss. 1995), we revisited these principles and affirmed them when the Court stated:

The general rule as applied at common law, is that a servant, in general employment of one person, who is temporarily loaned to another person to do the latter's work, becomes, for the time being, the servant of the borrower, although he remains in the general employment of the lender. The borrower then becomes the employer to the exclusion of the lender. **Application of the rule depends upon the question of whose work is being performed, and if the lender is to escape liability, it must appear that the servant is under the borrower's exclusive control and direction as to the work in progress.** When an employee voluntarily accepts and enters upon such an assignment, he ceases to be in the course of the employment by the lender or the general employer. However, while the "loaned servant" doctrine is generally considered

applicable in the compensation field, a shift of emphasis will be noted as to three pertinent questions involved, viz.: **(1)whose work is being performed, (2) who controls or has the right to control the workman as to the work being performed, and (3) has the workman voluntarily accepted the special employment.**

*Id.* at 589 (*quoting* Dunn*., Mississippi Workers' Compensation Law §* 186 (1986)).

¶18. Thus, we are guided by three important factors in analyzing any employment relationship: (1) whose work is being performed; (2) who has the right to control the worker in his duties on the job; and (3) the existence of an employment contract between the employee and the special employer whether actual or implied, *Quick Change* at 592; *Index Drilling Co. v. Williams*, 242 Miss. 775, 786-87, 137 So. 2d 525, 529 (1962); *Clark v. Luther McGill, Inc.* 240 Miss. at 517, 127 So. 2d at 861. There is a noticeable distinction between the phrase ". . . has the workman voluntarily accepted the special employment. . ." and the phrase ". . . a contract [must have been] made between the special employer and the employee. . . " However, the two phrases are not inconsistent with each other, and given that they are mentioned with the other two factors, it seems apparent that they mean the same thing: the acceptance of the special employment by the employee may be accomplished through express or implied contract.

¶19. It is undisputed that the work that was being done at the time of the accident was that of McCaskill Brothers. Neither Reeves, Contractor, Inc. nor James Reeves personally were parties to the contract to construct any part of the Howard expansion. Reeves's sole purpose for being on the construction site was to dig a hole which McCaskill Brothers would have dug itself had it owned a trackhoe.

¶20. The second factor, right of control, is the determinative factor in ascertaining whether an employment relationship is that of master-servant or one of principal-independent contractor. In determining the meaning of the term "control," we are guided by two cases involving a similar employment dilemma.

¶21. In *Denton v. Yazoo & Mississippi Valley Railroad Co.*, 284 U.S. 305, 309 (1931), the United States Supreme Court stated:

> To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. **Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking**.

*quoting* ***Standard Oil Co. v. Anderson,*** 212 U.S. 215, 221-22 (1909) (emphasis added). See also *Quick Change*,633 So. 2d at 591.

¶22. ***Standard Oil,*** *supra,* the case which provided the basis of the *Denton* decision*,* contained a similar employment dilemma. In that case, a winchman in the general service of Standard Oil Company was furnished by that company to a master stevedore under contract with the company to load a ship with oil. To load the oil, the winchman necessarily had to depend upon the aid of one of

the stevedore's employees to determine the proper time for hoisting and lowering the drums of oil. One of the stevedore's employees was injured when the winchman lowered the cases of oil before being told to do so. The United States Supreme Court held upon the facts that the power, the winch, and the winchman were those of Standard Oil Company, and that the company did not furnish **them**, but furnished the **work they did** to the stevedore; and that this work was done by the company as its own work, by its own instrumentalities and servant under its control. See *Denton*, 212 U.S. at 310 (emphasis in original). The Supreme Court in *Standard Oil* went on to say:

> Much stress is laid upon the fact that the winchman obeyed the signals of the gangman, who represented the master stevedore, in timing the raising and lowering of the cases of oil. But when one large general work is undertaken by different persons, doing distinct parts of the same undertaking, there must be co-operation and coordination or there will be chaos. The giving of the signals under the circumstances of this case was not the giving of orders, but of information; and the obedience to those signals showed co-operation rather than subordination, and is not enough to show that there has been a change of masters . . .

*Standard Oil Co.,* 212 U.S. at 226. The Court went on to quote Chief Judge Holmes of the Massachusetts Supreme Court (later Mr. Justice Holmes of the United States Supreme Court):

> But the mere fact that a servant is sent to do work pointed out to him by a person who has made a bargain with his master does not make him that person's servant; more than that is necessary to take him out of the relation established by the only contract which he has made, and to make him a voluntary subject of a new sovereign . . .

> . . .in such cases the party who employs the contractor indicates the work to be done and in that sense controls the servant, as he would control the contractor, if he were present. But the person who receives such orders is not subject to the general orders of the party who gives them. He does his own business in his own way, and the orders he receives simply point out to him the work which he or his master has undertaken to do. There is not that degree of generality and intimacy in the subjection of one to the other which is necessary in order to identify the two and to make the employer liable under the fiction that the act of the employed is his act.

*Standard Oil Co.,* 214 U.S. at 225-26 (*quoting Driscoll v. Towle,* 181 Mass. 416, 63 N.E. 922 (1902)).

¶23. This Court, in the case of *Runnels v. Burdine*, 234 Miss. 272, 106 So. 2d 49 (1958), reached the opposite conclusion. In that case, Runnels, an employee of Longview Equipment Company, was injured by the operator of a dragline that Longview had rented by the hour from Burdine Construction Company. The operator was in the employ of Burdine, and his only business at the construction site was to run the dragline. There was no subcontract between Longview and Burdine. This Court felt that Longview had the right to, and did control the work of the dragline operator. We held that Runnels could not recover damages from Burdine because the dragline operator was in the employ of Longview for the time that he worked on the dragline, and was thus a co-employee of Runnels.

¶24. *Clark v. Luther McGill, supra,* decided three years after *Runnels v. Burdine*, reached the

opposite conclusion of that reached in *Runnels*. In that case, we held that a worker who was injured while helping Luther McGill, Inc., an independent hauling company, to set up equipment owned by the worker's employer was not the loaned servant of the Luther McGill, Inc., even though he obeyed the instructions of the haulers in trying to set up the equipment. Thirty-four years later, this Court held in the case of *Luther McGill, Inc. v. Bradley*, 674 So.2d 11, 14 (Miss. 1996), that on strikingly similar facts, an employee injured while helping Luther McGill, Inc., to set up equipment was not the loaned employee of the hauling company. This holding was on the basis that although the principal of the injured worker supervised the details of the Luther McGill's work, the principal could fire the company, but no specific workers from the company. As a result, Luther McGill, Inc. retained enough control over its workers and its operation that it was an independent contractor and thus not immune from suit for actions stemming from its activities.

¶25. It should be noted that *Clark,* as discussed *supra,* was the case that set out the three-factor test for determining whether a worker was the loaned servant of a special master or whether that worker was an independent contractor, or the agent of the independent contractor. *Runnels v. Burdine* did not discuss those factors but discussed the facts of its case within the context of the general rule for loaned employees. Therefore, *Runnels* concentrates on the relationship between the borrower and the lender; *Clark* requires that concentration be focused on the relationship between the special employer and the employee. *Clark* did not overrule *Runnels*. Rather, it expounded upon the loaned employee doctrine, and in so doing, reached a result more akin to those reached by the United States Supreme Court in *Denton* and *Standard Oil Co.* This Court has been consistent in its decisions since the application of the *Clark* factors to the facts of a particular case. *See Luther McGill v. Bradley,* 674 So.2d 11 (Miss. 1996); *Quick Change Oil and Lube, Inc., supra; Northern Electric Co. v. Phillips,* 660 So.2d 1278 (Miss. 1995); *Richardson v. APAC-Mississippi, Inc.,* 631 So.2d 143 (Miss.1994); *W.J.Runyon & Sons v. Davis,* 605 So. 2d 38 (Miss. 1992); *Webster v. Mississippi Publishers Corp.,* 571 So.2d 946 (Miss. 1990); *Fruchter v. Lynch Oil Co.*, 522 So.2d 195 (Miss. 1988); *Biggart v. Texas Eastern Trans. Corp.*, 235 So. 2d 443 (Miss. 1970); *Louis A. Gily and Sons v. Dependents of Shankle*, 246 Miss.384, 149 So.2d 480 (1963).

¶26. James Reeves, Contractor, Inc. insists that the relationship was one of master-servant because James Reeves, Jr. submitted himself to the direction and control of John McCaskill, Jr. in the intricate details of digging the hole. Reeves makes much ado about the fact that McCaskill showed him where to dig, how deep to dig and how wide to dig. However, it is apparent from the facts that the hole had to be a certain depth, and the top elevation of the manhole had to be within one inch of the existing road. Therefore any assistance or orders as to when to start or stop digging was necessary to get the hole to the precise depth to accommodate the elevation specifications in the blueprint. This is not control, this is information. The situation before this Court is analogous to that faced by those Courts in *Denton, Standard Oil Co.,* and *Driscoll v. Towle.* The orders given were to coordinate an activity, digging the hole, which is part of a larger undertaking, the construction of a sewer lift station, which was in turn part of the overall plumbing work to be done on the project. Had McCaskill, Jr. not informed Reeves when to stop digging, Reeves would have had no way of knowing when the hole was deep enough. Furthermore, McCaskill could not measure the elevation at the same time that Reeves was trying to dig. Had he attempted to do so, he might have been injured by the trackhoe, as the plaintiff in *Standard Oil* was injured when the winchman dropped the load without being instructed to do so. Such an exchange of information is insufficient to establish control

necessary to transform this independent contractor relationship into a "loaned servant" relationship.

¶27. Even if the necessary control were present in this case, the relationship still cannot be transformed into a master-servant relationship because no express or implied contract existed between McCaskill Brothers and James Reeves, Jr. to the extent necessary to create such a relationship. McCaskill Brothers called James Reeves, Contractor, Inc. to arrange for a trackhoe and operator to be at the construction site the next morning. James Reeves, Jr. took the call and decided to do the job himself because he was the only trackhoe operator available. The contract was between the two construction companies, not between McCaskill Brothers and Reeves. Therefore when Reeves went to the construction site, he went not at his own behest, but at the behest of James Reeves, Contractor, Inc. in order to fulfill the contract that he had entered into the previous day on behalf of the company.

¶28. Reeves had no responsibilities aside from digging the hole. McCaskill, Jr. stated that it would not have been Reeves' place to do anything else, and McCaskill would not have asked Reeves to do so because McCaskill had regular employees to do everything except dig the hole. *Clark v. Luther McGill, Inc.*, *supra,* insists that there be a clear showing that the employee has entered into a contract with the special employer sufficient to establish a master-servant relationship between the special employer and the employee. In this case, it would appear that Reeves was not doing anything that was outside the ordinary scope of the work that an employee would normally do for Reeves Contractor, Inc. This is especially true since the company regularly rented large equipment complete with an operator. Therefore he remained the employee of Reeves, Contractor, Inc. when he was on the construction site on the day of the accident.

¶29. Since there is no clear showing that either an express or an implied contract existed between Reeves and McCaskill Brothers sufficient to transform the relationship into a master-servant relationship, and because the instructions which Reeves took from McCaskill were in the nature of cooperation and not subordination, the ruling of the trial court as to James Reeves, Contractor, Inc. is hereby reversed and remanded.

> SMITH, J., FOR THE COURT:

II.

> **WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT HOWARD INDUSTRIES, INC. OWED NO DUTY TO WILLIS COOLEY.**

¶30. The plaintiffs also charge that the trial court erred in holding that there was no duty owing to Willis Cooley on the part of Howard Industries. The trial court based its decision on the fact that Jones County, not Howard, was the owner of the construction site. Since Howard was not the owner, the judge ruled that Howard had no liability to Willis Cooley for any accidents occurring on the premises. Howard contends that it acted as the agent of the owner. As such, it incurs no liability in acting on its principal's contracts. *Turner v. Wilson*, 620 So. 2d 545, 548 (Miss. 1993); *Thames & Co. v. Eicher*, 373 So.2d 1033, 1035 (Miss. 1979). On this basis alone, we agree with the judgment of the trial court, and affirm the trial court decision as to this issue.

¶31. However, even if this avenue of recovery were not closed to the plaintiffs, Howard would still not be liable. Under Mississippi law, the duty owed by a premises owner or occupier to a business invitee, in this case McCaskill Brothers, is that duty to exercise reasonable or ordinary care to keep the premises in a reasonably safe condition. The owner/occupier is not an insurer of the invitee's safety, and he is not liable for injuries which are not dangerous or which are, or should be known to the business invitee. ***Jackson Ready-Mix Concrete v. Sexton***, 235 So. 2d 267, 270 (Miss. 1970).

*¶32. Jackson Ready-Mix Concrete* also states that "the owner or occupier is under no duty to protect them (contractors) against risks arising from or intimately connected with defects of the premises, or of machinery or appliances located thereon, which the contractor has undertaken to repair." *Id.* at 271. The plaintiffs argue that neither McCaskill Brothers nor Cooley had undertaken to repair the defect in the subsurface, thus that exception to the general rule requiring the owner to furnish a safe place to work is inapplicable. This depends upon the perspective from which one examines this case.

¶33. On the one hand, it could be argued that the installation of a dewatering system such as the one installed by McCaskill brothers could be seen as a repair mechanism which was necessary before they could excavate the hole. Such a perspective would place this case squarely within the purview of ***Jackson Ready-Mix Concrete***. However, it must be noted that Cooley was not killed while installing the dewatering system. On the other hand, one could take the view, as do the plaintiffs, that McCaskill Brothers was at the site to do contract plumbing work, not to repair a defect in the soil. If the latter view is chosen, then the case is within the purview of ***Magee v. Transcontinental Pipeline Corp.***, 551 So.2d 182, 185 (Miss. 1989). Therein we held that:

> Where a party . . . contracts with another . . . to perform original construction or repair work . . . and devolves upon the contractor the right and fact of control of the premises and the nature and details of the work, the owner has no liabilities for injuries experienced by the contractor's workers where those injuries arose out of or were intimately connected with the work.

¶34. ***Magee*** went on to state that the critical factor in determining if the occupier is absolved of liability is whether it maintains any right of control over the performance of that aspect of the work which gave rise to the injury, ***Magee*** at 186. "In this setting, it is the undisputed language of the contract which becomes important." *Id.* Section 3.3.1 of the "General Conditions of the Contract for Construction" provides that:

> The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless Contract Documents give other specific instructions concerning these matters.

Therefore, since McCaskill Brothers had unfettered control over that portion of the work which gave rise to the injury, the excavation of the hole, Howard is absolved of responsibility under ***Magee*** as well as ***Jackson Ready-Mix Concrete***.

¶35. Moreover, even if there existed a duty on the part of Howard to make the premises safe, the only way in which that duty would remain intact is if John McCaskill, Jr., as site supervisor, did not

know of the condition of the soil. In **City of Jackson v. Ball**, 562 So.2d 1267, 1270 (Miss. 1990), we held that no warning need be given to employees of a contractor so long as the contractor knows of the danger. *See also* **Mississippi Chemical Corp. v. Rogers**, 368 So.2d 220,222 (Miss. 1979). Here there may be a dispute as to a material fact. Reeves claimed that he stopped digging and went and told McCaskill about the watersand under the surface when he observed it, and that McCaskill instructed him to keep digging. McCaskill denies any such conversation ever took place. This conversation, or lack thereof, certainly goes to McCaskill's knowledge of the soil condition. However, it is not the only means by which McCaskill would have knowledge of the soil conditions. Because he was on the site at all times, and was in fact running the transit to measure the elevation of the hole, he would have had additional opportunity to observe the condition of the subsurface. It must be pointed out, however, that according to the contract between McCaskill Brothers and Jones County, McCaskill Brothers is chargeable with knowledge of the soil conditions as a prerequisite to signing the contract. Section 1.2.2 states that **"Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become familiar with local conditions under which the Work is to be performed and correlated personal observations with the requirements of the Contract Documents."** (emphasis supplied). Thus, according to **Jackson Ready-Mix Concrete**, Howard had no duty to warn of a danger which McCaskill should reasonably have appreciated before exposing himself (and by extension, his employees) to it. Such an expectation of appreciation is reasonable because under the contract McCaskill had visited the site and had familiarized himself with the soil conditions. Accordingly, we find that for this additional reason, the judgment as to the defendant, Howard Industries, Inc., is affirmed.

## III.

**WHETHER THE TRIAL COURT ERRED IN HOLDING THAT EVEN IF HOWARD INDUSTRIES OWED WILLIS COOLEY A DUTY, THE DANGEROUS SUBSURFACE SOIL CONDITIONS WERE OPEN AND OBVIOUS, THUS RELIEVING HOWARD OF ITS DUTY.**

¶36. The plaintiffs next claim that the trial court based its decision on the "open and obvious" defense at page 1000 of the record. The plaintiffs correctly note that this Court abandoned the "open and obvious" defense as a complete bar to recovery in premises liability cases in **Tharp v. Bunge Corp.** 641 So. 2d 20 (Miss. 1994). However, after reading the entire ruling of the trial court, especially as it pertains to Howard Industries, it is apparent that the words "open and obvious" or any hint that such a defense might have been the basis for the trial court's decision are strictly a figment of the plaintiffs' attorney's imagination. Accordingly, it is unnecessary to address this point.

## IV.

**WHETHER THE TRIAL COURT ERRED IN RULING THAT FOIL-WYATT WAS ENTITLED TO JUDGMENT AS A MATTER OF LAW DESPITE ITS PRIOR KNOWLEDGE THAT THE SUBSURFACE SOIL CONDITIONS WERE WET, SANDY, AND SILTY CLAY, AND DESPITE ITS FAILURE TO SO INFORM McCASKILL BROTHERS.**

¶37. This is perhaps the most interesting of the issues raised in the case *sub judice*. It is certainly an issue of first impression before this Court. Put succinctly, the question to be answered is whether there was a common law duty to warn on the part of the architects based upon their prior knowledge of the dangerous soil conditions. Couched in these terms, this would be an issue of first impression before most state courts in the Union. However, the issue of architectural liability for construction worker injury has been dealt with in other courts. A brief summary of those cases would show that other state courts have held that unless the architect undertakes specific supervisory duties by contract or by deed, there can be no liability on the part of the architect for job site injuries to construction workers absent a defect in the architects' plans. Since it is not alleged that there is a defect in the architects' plans, and because they specifically contracted away all supervisory powers and made no actual efforts to supervise, none of our sister states who have addressed the issue would hold Foil-Wyatt liable to the plaintiffs for the fatal injuries to Willis Cooley.

¶38. Because our sister states would likely decline to extend liability to Foil-Wyatt does not mean that the plaintiffs' argument is frivolous. One articulable reason in favor of holding the architect liable is that the status of the professional architect confers special duties upon him to warn the contractor and/or the contractor's employees due to the foreseeability of harm if no such warnings are given. *See Tarasoff v. Regents of the University of California,* 17 Cal.3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (1975)(A psychiatrist treating a deranged patient was held liable to the victim of patient's assault where the doctor failed to warn the victim of patient's ill intent toward him.). In other words, because the architect knows of the danger and is in a position to take reasonable steps to prevent the harm, he must give a warning that would allow those in control to prevent harm to the worker. We reject this argument.

¶39. That particular view flies in the face of the view set forth in § 314 of the Restatement (Second) of Torts which states that "the fact that an actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." The Restatement view is the more common sense approach in our opinion, and, accordingly, is the road that we choose to travel in deciding this issue.

¶40. Foil-Wyatt, for its part, cites several cases to bolster its contention that there is no liability incurred by it. None of the cases cited by Foil-Wyatt deal with the question of the existence of a common law duty to warn of defects known to the architect. But all make it apparent, to one extent or another, that the view of those courts which have examined the issue is that there can generally be no architectural liability where there is no supervisory duty. See *Walker v. Wittenburg, Delony & Davidson*, 412 S.W.2d 621 (Ark. 1967)(the architect must make an express agreement to supervise the construction site to incur liability); *Wheeler & Lewis v. Slifer,* 577 P.2d 1092 (Colo. 1978) (architects not liable where the employee of a subcontractor was injured because the performance of architectural duties did not impose a duty of supervision upon the architects); *Hanna v. Huer, Johns Neel, Rivers, & Webb,* 662 P.2d 243 (Kan. 1983) (architect who has agreed to supervise the project must specifically agree to supervise safety; also lists seven factors to use in determining whether supervisory powers go beyond the provisions of the contract: (1) actual supervision and control of the work; (2) retention of the right to supervise and control; (3) constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) assumption of responsibilities for safety practices; (6) authority to issue change orders; (7) the right to stop the work); *Reber v. Chandler High School District # 202,* 13 Ariz.App. 133, 474 P.2d 852 (1970) (the

term "supervision" construed as limited to ensuring that the finished product conformed to specifications). As noted above, the contractor had responsibility for day to day supervision of the work. Foil-Wyatt had none of the responsibility listed in any of the *Hanna* factors.

¶41. The plaintiffs cite *Moloso v. State*, 644 P.2d 205 (Ak. 1982), as the primary case which supports their contention of liability on the part of Foil-Wyatt. In that case, two construction workers were killed in a rock slide while clearing land for a state highway project. Their estates brought suit against the state of Alaska for failure to adequately oversee the correct sloping of the rock overhang which crumbled and caused the fatal injuries. That court held that summary judgment was precluded against the plaintiffs because a jury question existed as to whether the state had breached its duty as architect to supervise the project. It is important to note that in that case the state had specifically undertaken not only to carry out the project, but had done the architectural work, had acted in the capacity of supervisor and it was the state's responsibility to ensure that overhangs were properly sloped to minimized the possibility of rock slides. Foil-Wyatt undertook no such responsibility. In fact, in none of the cases either cited by the plaintiffs or noted by this Court where the architect was held liable for workplace injuries was there an instance where the architect did not have on-site supervisory powers, either contractual or assumed. As a result, we find *Moloso* unavailing to the plaintiffs' claim. *See Erhart v. Hummonds,* 232 Ark. 133, 334 S.W.2d 869 (1960) (action will lie against architects for fatal injuries to construction workers where architects had general supervisory powers and a right to stop work to insure proper execution of the contract); *Day v. U.S. Radiator Corp.* 241 La. 288, 128 So. 2d 660 (La. 1961) (architects were held not liable because they had no duty to inspect methods of boiler installation); *Miller v. Dewitt,* 37 Ill. 2d 273, 226 N.E.2d 630(1967) (evidence authorized a finding that architects with the right to stop work if the contractor began to shore the roof in an unsafe manner had been negligent in failing to inspect and watch over the shoring operation.); *Walker v. Wittenberg, Delony, & Davidson, supra*, (architect's agreement to supervise construction did not encompass the duty to supervise safety *because* the contractor had contractually agreed with the owner to designate a safety coordinator and give that person's name to the architect).

¶42. We philosophically disagree with the holdings of *Hanna* and *Walker* to the extent that they hold that a contractual duty to maintain actual supervision over the details of the construction project does not entail the duty to supervise safety. It would seem natural that the supervision of safety is encompassed in the duty to supervise, and no separate agreement to supervise safety is necessary where the architect is supervising the details of every other aspect of the project. *See Mallow v. Tucker, Sadler, & Bennett, Architects & Engineering, Inc.*, 54 Cal. Rptr. 174, 176 (Cal. Ct. App. 1966) ("An architect who plans and supervises construction work, as an independent contractor, is under a duty to exercise ordinary care in the course thereof for the protection of any person who foreseeable and with reasonable certainty may be injured by his failure to do so."); *Case v. Midwestern Contractors*, 876 S.W.2d 51, 53 (Mo. App. W.D. 1994)(the fact that the architect agreed to review the safety procedures of the contractor was insufficient to make the architect a construction supervisor or to hold him responsible for the safety of the construction workers where those responsibilities **expressly** belonged to the contractor); *Dillard v. Shaughnessy, Fickel, & Scott* 864 S.W.2d 368 (Mo. App. W.D. 1993). It is notable that in the latter two Missouri cases, safety is an aspect of supervision. In both cases, the architect was not an on-site supervisor, and thus not an insurer of safety. It does not follow that an architect who is an on-site supervisor would still

have to contractually provide for the supervision of the safety of the workers. To allow such an action would skirt the meaning of the term "supervisor." However, we are not faced that question here.

¶43. The question before us is whether the architect has a duty to warn the contractors of defects inherent in the construction site of which he has knowledge. Two cases help in the assessment of that question. ***Young v. Eastern Engineering & Elevator Co., Inc.***, 554 A.2d 77 (Pa. Super. 1989), held that there was no duty to warn **because** there was no duty to supervise. That court stated:

> We therefore hold that absent an undertaking by an architect, by contract or conduct, of the responsibilities of the supervision of construction and the maintenance of safe conditions of a construction project, an architect is not under a duty to notify workers or employees of the contractor or subcontractors of hazardous conditions on the construction site.

*Id*. at 80. In the case of ***Balagna v. Shawnee County***, 668 P.2d 157 (Kan. 1983), that court held that a duty existed where an ***on-site*** architect/engineer knew of unsafe conditions, and that it was a question for the jury as to whether the engineer's decision not to warn the worker of the unsafe condition was reasonable under the circumstances.

¶44. It is the opinion of this Court that the holding of ***Young*** provides the clearest pronouncement on the issue before the Court and makes the most common sense under the circumstances. Unless the architect has undertaken by conduct or contract to supervise a construction project, he is under no duty to notify or warn workers or employees of the contractor or subcontractor of hazardous conditions on the construction site.

¶45. Therefore, we affirm the decision of the trial judge as to this issue.

**V.**

### WHETHER THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE AN AFFIDAVIT FILED AFTER THE HEARING ON THE MOTIONS FOR SUMMARY JUDGMENT.

¶**46.** Rule 56(c) of the M.R.C.P. states that motions for summary judgments may be served within ten days of the time fixed for the hearing on the motion for summary judgment. Adverse parties may serve affidavits prior to the day affixed for the hearing. Rule 6(d) of the M.R.C.P. provides that when a motion is supported by an affidavit, the affidavit **shall** be served with the motion, and opposing affidavits may be served not later than one day before the hearing, unless the court has given permission to serve them at some other time.

¶47. In the case *sub judice* the plaintiffs raise the issue of whether or not the trial court should have accepted an affidavit from John McCaskill, Jr. regarding the subsurface conditions at the construction site. That affidavit was sworn on May 18, 1993 and filed on June 1, 1993. The hearing on the Motions for Summary Judgment was held on March 11, 1993, more than two months before the affidavit was sworn or filed. Whether Howard was acting as the moving party or was acting in response to the plaintiffs' Cross -Motion for Summary Judgment, the affidavit was late and is not allowed under either Rule 6(d) or Rule 56(c) of the M.R.C.P.

¶48. Howard claims that the trial court requested briefs and proposed findings of fact after the hearing date, and that the only reason that the affidavit itself was sworn and filed was that the plaintiffs' brief raised several arguments which were not made at oral arguments. Even if that were the case, the transcript of the oral argument is not a part of the record for consideration before us. As a result, this Court cannot consider what may or may not have been a basis for oral argument juxtaposed against the briefs submitted by either party.

¶49. Howard further argues that Rule 56(e) of the M.R.C.P. allows for the trial court to consider supplemental affidavits. While that may be true, Rule 56(e) does not allow for such supplemental affidavits to be submitted after the time set out in Rule 56(c) or in Rule 6(d).

¶50. In ***Richardson v. APAC-Mississippi, Inc.***, 631 So.2d 143, 146 (Miss.1994), we upheld a trial judge's order striking affidavits of a party opposing summary judgment on the grounds that they were not filed until the day of the hearing. That decision was based in part upon ***Lujan v. National Wildlife Federation***, 497 U.S. 871, 895-97 (1990), wherein the United States Supreme Court held that under Rule 6(b) of the Fed.R.Civ.P., upon which the M.R.C.P. are based, an affidavit which was filed late must be for cause shown, and only after cause has been shown may a judge invoke his discretion in accepting or rejecting the late submission. There being no cause shown as to the reasons why this affidavit was filed after the allowable time set forth in the rules, the affidavit should not have been accepted by the trial judge.

¶51. Nevertheless, for the reasons set forth in part II of this memorandum, the affidavit would not alter the determination of whether Howard had a duty to Cooley because, as was stated earlier, Howard was an agent of Jones County, the true owner of the property. As a result, Howard, as agent for Jones County, had given over possession of the property to McCaskill Brothers and the other contractor who were to complete the expansion. Thus, the trial court's consideration of the affidavit was harmless error.

## CONCLUSION

¶**52.** This Court holds that the decision of the trial court is reversed and remanded to the trial court as to James Reeves, Contractor, Inc. because the totality of the circumstances leads us to find that James Reeves, Jr. acted as an independent contractor in excavating the manhole on the date in question. We affirm the decision of the trial court as to Howard Industries because Howard acted as agent for Jones County, and as an agent, incurred no liability for the acts of its principal. Additionally, Howard Industries is not liable because McCaskill Brothers, as employer of Willis Cooley, was evidently and contractually knowledgeable about the condition of the soil. We affirm the decision of the trial court as to Foil-Wyatt, the project architect, because they did not undertake supervision of the project either by conduct or by contract, and therefore, had no affirmative duty to warn McCaskill Brothers or its employees of dangers of which they may have been aware. We hold that the trial court's decision to admit an affidavit after the time allowed in the M.R.C.P. was harmless error.

¶53. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**PART I: SULLIVAN, P.J., LEE, C.J., PITTMAN, BANKS AND McRAE, JJ., CONCUR.**

**SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PRATHER, P.J., ROBERTS AND MILLS, JJ.**

**PART II: SMITH, J., LEE, C.J., PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, ROBERTS AND MILLS, JJ., CONCUR. McRAE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

**McRAE, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶54. I agree with Justice Sullivan's finding in Part I that the circuit court erred in finding that James Reeves, Jr. was a co-employee of Cooley's under the "dual employee" or "loaned servant" doctrines, putting both in a master-servant relationship with McCaskill Brothers and making James Reeves, Contractors, Inc. statutorily immune from suit. We have never considered our Workers' Compensation cases from the perspective of the employee, considering who he thinks his employer is, who pays his wages and who files his W-2 forms. To mislabel an employee defeats the beneficent purposes of the Act and disregards that only one employer can take advantage of its immunity provisions. I disagree, however, with the majority's findings regarding an architect's duty to warn of hazardous conditions at a construction site.

¶55. The Workers' Compensation Act provides detailed definitions of "employee" and "independent contractor" but states only that the term "employer" may include any of a number of legal entities. Miss. Code Ann. § 71-3-3. The exclusivity of liability provision of Miss. Code Ann. § 71-3-9, however, is intended to protect one and only one employer. Further, § 71-3-71 enables the employee to bring suit against a third party whose actions contributed to his injury or death. His employer and its worker's compensation insurance carrier also have the right to join in the suit or intervene.

¶56. The employee who is a "loaned servant" is sent to work where his employer sends him to carry out whatever tasks he may be assigned. To determine who his actual employer is at the time an accident occurs, we must look, from the perspective of the worker who is asserted to be a loaned servant, at who he considers to be his boss, who hires him and who files his W-2 form. As the majority points out, James Reeves, Jr., the trackhoe operator, went to the construction site "not at his own behest, but at the behest of James Reeves, Contractors, Inc. in order to fulfill the contract that he had entered into the previous day on behalf of the company." Unlike Cooley, he did not look to McCaskill Brothers as his boss, nor did that company hire him or file his W-2 forms. Rather, he was an employee of Reeves, Contractors, Inc. He was not a loaned servant of McCaskill Brothers and he and Cooley were not co-employees. Thus, the majority correctly finds that suit could be brought against Reeves Contractors.

¶57. As the majority notes, this Court long has been perplexed by the distinctions between a borrowed or loan servant and an independent contractor. The Act, however, is explicit. Were a so-called borrowed servant to have more than one employer, the statute would say so. The only way we can end the confusion and carry out the purposes of the Act, is to look at who the employer is from the perspective of the employee on the day he was injured. To do otherwise, keeps the employee in

peril and limits him from recovering all damages to which he might be entitled. Moreover, for the sake of the actual employer who is forced to pay large premiums, the waiver of immunity ought to apply where there is liability insurance up to the amount of the coverage provided by the policy.

¶58. I am not, however, willing to accept the majority's proposition that since none of our Sister States [sic] would find the architect liable for failure to warn the general contractor of a dangerous soil condition at the work site, there is no duty. The two cases to which the majority briefly turns for authority, *Young v. Eastern Engineering and Elevator Co., Inc.,* 381 Pa. Super. 428, 554 A.2d 77 (1988) and *Balagna v. Shawnee County,* 233 Kan. 1068, 668 P.2d 157 (1983), are factually distinguishable from the case *sub judice* and hardly stand as authority that for the absolute limits placed by the majority on the extent of an architect's potential liability.

¶59. In *Young*, a construction worker was seriously injured when he fell through a twenty-inch gap in the drywall surrounding the elevator shaft on which he was working. As distinguished from the case *sub judice,* where the fatal accident appears to have been the result of a pre-existing natural soil condition, Young's injuries were the result of defective construction and /or inadequate safety precautions by the contractor and subcontractors. *Young,* 554 A.2d at 78. Because the architect had no contractual duty to supervise the actual construction of the building, the Pennsylvania court found, under the facts of the case, that "an architect is not under a duty to notify workers or employees of the contractor or subcontractor of hazardous conditions on the construction site." *Id.* at 81. The court acknowledged that jurisdictions are split, with no clear majority, as to whether an architect may be liable for injuries caused by hazards a t a construction site and noted:

> It would appear that an architect who, acting as an independent contractor, plans and supervises construction work is under a duty to exercise ordinary care in doing so in order to protect any person who foreseeably and with reasonable certainty may be injured by his failure to do so.

554 A.2d at 79. In the case *sub judice*, the matter of architect supervision would not even come into play since the hazard at issue was inherent to the site and as the majority intimates, known to the architects during the planning or design stage. It is not as if the danger suddenly arose during construction, discernable only if the architects were involved in some supervisory capacity. Thus, to exercise ordinary care, the architects had a duty to warn the contractor of any hazardous conditions at the site of which they were aware.

¶60. In *Balagna,* where a worker was killed when the trench in which he was working caved in, the issue was whether the architect/engineer was liable for the contractor's failure to follow required safety practices. *Balagna,* 668 P.2d at 162. In that case, it was asserted that liability existed because of a contractual duty to supervise and because the architect failed to take any action after discovering that the contractor was not following proper safety practices in the trenching operation. *Id.* The court quoted an earlier Kansas case, *Hanna v. Huer, Johns, Neel, Rivers & Webb,* 233 Kan. 206, 662 P.2d 243 (1983), stating in part, "[a]s a professional, an architect cannot stand idly by with actual knowledge of unsafe practices on the job site and take no steps to advise or warn the owner or contractor." *Balagna,* 668 P.2d at 163, quoting syllabus, paragraph 5 of *Hanna. See also Estate of Clark,* 33 Mich. App. 395, 190 N.W. 2d 373 (1971) rev'd on other grounds, 388 Mich. 637, 202 N.W. 2d 300 (1972)(where twenty percent of architect's fee allocated to project supervision, he had duty to warn workers of danger). It further noted that most cases involving architect liability turned

on specific facts, including whether the architect had actual knowledge of the dangerous condition. 668 P.2d at 163-164. In *Young,* finding that a duty existed to take some reasonable steps to prevent injury, the court ruled that there was a jury question as to whether the architect-engineer acted reasonably and reversed the lower court's grant of summary judgment. Although the case *sub judice* is again distinguishable because the architects had no supervisory duties and they were apparently aware of the dangerous site condition during the planning phase of the project before construction began, by analogy, we would have to say that an architect cannot stand idly by when he has knowledge of a dangerous condition that becomes apparent when he is assessing the site during the design process. At the very least, there exists a jury question of when the architects became aware of the hazardous condition at the site and whether they took reasonable steps to advise the contractor and owner of the situation and make appropriate design and construction specifications.

¶61. Accordingly, while I agree with Part I of the opinion, I think the majority makes too broad and quick a pronouncement regarding an architect's duty to warn of known hazards at a construction site.

**SMITH, JUSTICE, DISSENTING AS TO PART I:**

¶**62.** The obvious problem posed by the question of whether James Reeves, Jr. was the employee of Reeves Construction or of McCaskill Brothers Plumbing Company, Inc. at the time of the accident which resulted in Willis Cooley's death, is which line of authority of this Court should control, ***Clark v. Luther McGill, Inc.***, 240 Miss. 509, 127 So. 2d 858 (1961), or ***Runnels v. Burdine***, 234 Miss. 272, 106 So. 2d 49 (1958). ***Runnels*** was not overruled by this Court in its subsequent decision in ***Clark***, in which an opposite conclusion was reached.

¶63. In my view, ***Runnels*** is on all fours with the case *sub judice*. The ***Runnels*** Court was concerned with the question of whether Woodrow Kelly, a dragline operator and employee of Burdine, was the employee of Burdine or of Longview, who had requested the services of the dragline. The agreement between the parties was oral. A dragline was essential for Longview's construction of some concrete piers, but Longview did not own a dragline. During operation of the dragline, Kelly injured Runnels, an employee of Longview. Longview's insurer paid Runnels workers' compensation benefits. Subsequent thereto, Runnels filed suit against Burdine and the case was tried by a jury. The trial judge directed a verdict in favor or Burdine at the close of the plaintiff's case in chief, prompting an appeal to this Court by Runnels.

¶64. The ultimate question before the ***Runnels*** Court was who had the right to control and direct the work of Kelly in the operation of a dragline. The Court determined the issue turned on who had the right to control Kelly and direct his work in operating the dragline. The Court found that the substantial evidence showed that Longview had such right of control, and in fact, did control and direct Kelly's work. Burdine was never present on the worksite. There was no need nor opportunity for Burdine to direct the work of the dragline. Finally, all workmen on the premises were employees of Longview, and they furnished directions to Kelly as to the proper placment of the concrete mix which Kelly was pouring upon the piers when the accident occurred. The Court in holding that Runnels failed to sustain his burden of proof that Kelly was Burdine's servant at the time of the accident stated:

A person who is in the general employment of one person may be temporarily in the service of another with respect to a particular transaction or piece of work so that the relation of master and servant arises between them, even though the general employer may have no interest in the special work.

*Runnels*, 234 Miss. at 277, 106 So. 2d at 51, *quoting* ***Westover v. Hoover,*** 88 Neb. 201, 129 N.W. 285.

¶65. In ***Louis A. Gily & Sons v. Dependents of Shankle***, 246 Miss. 384, 149 So. 2d 480 (1963), another dragline case, the Court, again looking at who had the right of control, held that O'Neal was not an independent contractor but rather an employee of Gily, stating, "The traditional test of the employer-employee relation is the right of the employer to control the details of the work." 246 Miss. at 389, 149 So. 2d at 482. In ***Gily***, the Court found Gily instructed O'Neal where to dig, when he could work and that the dragline work was a necessary part of the performance of the contract. ***Id.***

¶66. The majority opinion favors the three-factor test established in ***Clark*** in determining whether an employee is a loaned servant or an independent contractor. In that case the Court concluded that a lent-employee's special character is determined from the fact that they begin with an existing employment relation with the presumption of a continuance of the general employment. Thus the Court stated:

> To overcome this presumption, it is not unreasonable to insist upon a clear demonstration that a new temporary employer has been substituted for the old, which demonstration should include a showing that a contract was made between the special employer and the employee, proof that the work being done was essentially that of the special employer, and proof that the special employer assumed the right to control ***details*** of the work.

*Clark*, 240 Miss. at 518, 127 So. 2d at 861, (*quoting* § 48.10, Vol.1, Larson's Workmen's Compensation Law)(emphasis added). This Court recently revisited these three principles in ***Quick Change Oil and Lube v. Rogers,*** 663 So. 2d 585 (Miss. 1995). There the Court stated, "and if the lender is to escape liability, it must appear that the servant is under the borrower's exclusive control and direction as to the work in progress."***Id.*** at 589. The Court again stated that "a shift of emphasis will be noted as to three pertinent questions involved, viz.: (1) whose work is being performed, (2) who controls or has the right to control the workman as to the work being performed, and (3)has the workman voluntarily accepted the special employment." ***Id.***

¶67. An analysis of the facts of the case *sub judice* applying the three factors is revealing indeed. Whose work was being done? Undisputedly, the work being done was that of McCaskill Brothers Construction. McCaskill had no means of performing this portion of their contract because the company did not own a trackhoe. Who had the right of control of Reeves? The majority, relying upon ***Denton v. Yazoo & Mississippi Valley Railroad Co.***, 284 U.S. 305, 309 (1931), claims that the digging of the hole in the case at bar under the supervision of McCaskill employee's "is not control, this is information." ***Majority*** at 16. The majority fails to note somehow the full context of the United States Supreme Court's choice of language on this issue. That Court noted that "Here we must carefully distinguish between authoritative direction and control, and mere ***suggestion as to details*** or the necessary cooperation, where the work furnished is part of a larger undertaking." ***Denton***, 284

U.S. at 309, *quoting Standard Oil Co. V. Anderson*, 212 U.S. 215, 221-22 (1909) (emphasis added) . *See also, Quick Change Oil* at 591. Here, there is much more involved than the mere giving of signals by McCaskill employees, as was the case in *Standard Oil*. Nor is this factual situation the same as helping set up equipment as was the case in *Clark v. Luther McGill* and the more recent case of *Luther McGill, Inc. v. Bradley*, 674 So. 2d 11 (1996). In those two cases, Luther McGill retained sufficient control over its workers and the work being performed to warrant a finding that McGill was an independent contractor rather than a loaned servant. Here, there were intricate details involved in digging the hole in question, details known only to McCaskill and totally unknown to James Reeves, Jr., the operator of the trackhoe who had just arrived on the job site pursuit to an oral argeement between the two companies. The work being performed was part of a detailed, architect drawn, sewer lift station which constantly required the use of a transit by McCaskill employees who were in and out of the hole in question, stopping and starting and giving specific instructions to Reeves in order to insure that the work was done in accordance to architectual plans and specifications. Reeves even lowered the concerete manhole into the hole at one point, requiring McCaskill to again use the transit of precise detailed measurements to insure that the top to the manhole was within one inch of the existing roadbed, all per the intricate details possessed solely by McCaskill. McCaskill selected the spot, drew the circle for placement of the trackhoe, instructed Reeves of various nearby hazards to avoid, i.e. a grade beam, a water line, and the well-point system both in and around the excavation point. The well-point system was utilized for the purpose of dewatering or pulling moisture out of the excavation site, which process would make the soil more compact and lessen the chance of a cave-in. Reeves maintained that he stopped digging at one point because he discovered a flowing stratum of "watersand" in the subsurface. He claims he told McCaskill of this situation, but McCaskill denied that any such conversation ever took place. However, the fact that McCaskill had the device installed on the premises for several days prior to Reeves ever arriving to dig the hole in question strongly suggests Reeves's testimony to be truthful.

¶68. The facts here are practically identical to those in *Runnels*. So much so, the only way the majority can prevail on this issue is to overrule *Runnels* and its subsequent line of authority which has heretofore not been attempted, not even in the Court's most recent case of *Luther McGill v. Bradley.*

¶69. I respectfully dissent to the majority's holding in Part I.

**PRATHER, P.J., ROBERTS AND MILLS, JJ., JOIN THIS OPINION.**