## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1998-CA-01208-SCT

*PATTON-TULLY TRANSPORTATION COMPANY*

*v.*

*JAMEY L. DOUGLAS, WENDY C. DOUGLAS AND MISSISSIPPI CASUALTY INSURANCE COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/11/1998 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK, JR. |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | FRANK THACKSTON |
| ATTORNEYS FOR APPELLEES: | HENRY DEAN ANDREWS, JR. |
| | GREGORY MOREAU JOHNSTON |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED -04/20/2000 |
| MOTION FOR REHEARING FILED: | 5/3/2000; denied 6/15/2000 |
| MANDATE ISSUED: | 6/22/2000 |

**BEFORE PRATHER, C.J., SMITH AND WALLER, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1. Patton-Tully Transportation Company ("Patton-Tully") appeals to this Court from the Circuit Court of Warren County, Mississippi, seeking reversal of the judgment for the appellee, Jamey L. Douglas ("Douglas") and Wendy C. Douglas. Jamey and Wendy Douglas filed suit on June 12, 1996, as a result of personal injuries Jamey received while working for B&L Construction Company on a vessel owned by Patton-Tully. The cause of action was based on the general maritime law and 33 U.S.C.§ 905(b) under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA).

¶2. Patton-Tully moved for summary judgment, claiming that as a matter of undisputed fact and law, Jamey Douglas was its borrowed servant; that his exclusive remedy against Patton-Tully was for benefits under the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), and that Patton-Tully was immune from tort suit even if it was guilty of negligence. The trial court denied the motion.

¶3. At the end of the plaintiffs' case in chief, Patton-Tully moved for a directed verdict and maintained that Jamey Douglas's own negligence, coupled with that of another co-employee, was the sole cause of his injury and as such Patton-Tully was not liable. The trial court denied this motion. The jury returned a verdict for Douglas and his wife in the amounts of $900,000 and $62,500 respectively. Judgment was entered on that verdict. Patton-Tully moved for judgment notwithstanding the verdict. The trial court denied that

motion. The trial court specifically found there were disputed issues of fact concerning whether Douglas was a "borrowed servant" and that there were not enough factors in favor of Patton-Tully for the court to rule as a matter of law that Douglas was a "borrowed servant."

¶4. After thorough review, we affirm the judgment of the trial court.

## STATEMENT OF THE FACTS

¶5. Jamey Douglas was employed as a welder by B&L Construction Company, Inc., in Vicksburg, Mississippi, doing iron work which consists of welding, cutting, and fabricating iron and steel. Douglas had been doing this work for approximately 15 years. B&L Construction is owned and operated by George Cousins ("Cousins") who was Douglas's boss and supervisor. Cousins received a call from Robert Barnes of Anderson-Tully (an affiliated corporation of Patton-Tully) asking if he could send some iron workers down to work on one of Patton-Tully's barges, the *John Morris*, which had been in an accident. On October 18, 1998, Cousins took Douglas and Donnie McKnight ("McKnight") to the Yazoo Diversion Canal, located in Vicksburg, Warren County, Mississippi, to work on the *John Morris*. The next day, Douglas and McKnight, along with two Patton-Tully employees, were instructed to lift heavy iron plates from the damaged vessel chest to head high and put them onto a dock barge docked beside the *John Morris*. Due to the rainy weather conditions and hydraulic oil, the *John Morris's* deck was extremely slippery, and the men were having to navigate over exposed steel floor joists. The *John Morris* and the barge docked beside it were pitching up and down due to the rain and wind on the canal that day.

¶6. Douglas complained about the conditions and suggested the need for a crane to move the heavy plates. Buddy Turner, Patton-Tully's foreman and supervisor for the work on the *John Morris*, told Douglas that he could either move the plates or he would find someone else who would. Douglas perceived that he would be sent back to Cousins and possibly lose his job if he did not lift the plates. It is alleged that after Douglas and the other men were lifting an iron plate up to place it on the other barge, one of the Patton-Tully employees slipped or dropped his end of the plate and the balance of the weight shifted to Douglas. Douglas immediately felt something pull in his back. He struggled through work the rest of the day, but by evening he was experiencing stiffness and severe pain. Douglas attempted to return to work on the next day but was unable to do so because the pain was too great. He informed Cousins of his injury after which he was fired the next day by Cousins. Douglas was diagnosed with multiple ruptured discs and underwent two surgeries in an attempt to repair the damage.

¶7. Patton-Tully's defense throughout the proceedings is that Douglas was its borrowed servant at the time the injury occurred, which if established, would limit Patton-Tully's liability to compensation under the Longshoremen's and Harbor Workers' Compensation Act 33 U.S.C.§ 901 et seq., since Douglas's exclusive remedy would be under that Act.

¶8. After the jury heard the testimony and the instructions of law were given by the court, the jury found that Patton-Tully, vessel owner of the *John Morris*, was negligent in whole or in part which proximately cause an injury or damage to Jamey Douglas. In response to special interrogatories the jury found that Douglas was not contributorily negligent.

## STATEMENT OF THE ISSUES

### I. WHETHER THE TRIAL COURT ERRED IN DENYING PATTON-TULLY'S

**MOTION TO RULE AS A MATTER OF LAW THAT JAMEY DOUGLAS WAS A BORROWED SERVANT.**

**II**. **WHETHER THE TRIAL COURT ERRED IN DENYING PATTON- TULLY'S MOTION FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT.**

**III. WHETHER THE TRIAL COURT MADE ERRONEOUS EVIDENTIARY FINDINGS AND IMPROPERLY INSTRUCTED THE JURY.**

## DISCUSSION OF LAW

**I. WHETHER THE TRIAL COURT ERRED IN HOLDING THAT JAMEY DOUGLAS WAS NOT THE BORROWED SERVANT OF PATTON-TULLY--THEREFORE AFFORDING DOUGLAS A NEGLIGENCE ACTION.**

### Standard of Review

¶9. This Court reviews matters involving summary judgment de novo. *Jones v. James Reeves Contractors, Inc.,* 701 So. 2d 774, 777 (Miss. 1997). A de novo review entails reviewing all evidentiary matters in the record: affidavits, depositions, admissions, interrogatories, etc. The evidence must be viewed in the light most favorable to the nonmoving parties, and they are to be given the benefit of every reasonable doubt. *Id*. A motion for summary judgment will lie only where there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. *Id.*

¶10. Patton-Tully's first allegation of error is that the trial court should have ruled, based upon the uncontradicted testimony of others, that as a matter of law Jamey Douglas was Patton-Tully's borrowed servant. Patton-Tully argues that whether Douglas is a" borrowed servant" is an issue of law and should have been decided by the court. *Capps v. N.L. Baroid-NL Indus., Inc.,* 784 F.2d 615, 617 (5th Cir. 1986). However, a dispute over whether one is a borrowed servant could still exist although all the facts were stipulated, for it concerns not only the facts themselves but the implications to be drawn from the facts. *Gaudet v. Exxon Corp.,* 562 F.2d 351, 358 ( 5th Cir. 1977)

¶11. Patton-Tully rests on the nine-factor test used by the Fifth Circuit to determine borrowed employee status to allege that Douglas is its borrowed servant. These nine factors are: (1) Who has control over the employee and the work he is performing, beyond mere suggestions of details or cooperation; (2) Whose work is being performed; (3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer; (4) Did the employee acquiesce in the new work situation; (5) Did the original employer terminate his relationship with the employee; (6) Who furnished tools and place for performance; (7) Was the new employment over a considerable length of time; (8) Who had the right to discharge the employee; (9) Who had the obligation to pay the employee. *Ruiz v. Shell Oil Co.,* 413 F.2d 310, 312-13 (5th Cir. 1969).

¶12. In this maritime personal injury suit, the principal question at issue is whether an injured employee was a borrowed servant at the time of his injury. If so, the injured employee's exclusive remedy would be for workmen's compensation rather than for damages in tort. *Id.* at 311. The question of whether a worker is a "borrowed servant" at a particular time is one which has perplexed this Court and others for decades. *Jones,* 701 So.2d at 777. *Ruiz* failed to detail how the test should be applied, which factors are to be

given primary weight, and which factors, if any, are controlling. *Gaudet v. Exxon Corp.,* 562 F.2d 351 (5th Cir. 1977). The court went on to say in *Ruiz* that, "no one of these factors, or any combination of them, is decisive, and no fixed test is used to determine the existence of a borrowed-servant relationship." 413 F.2d at 312.

¶13. In *Clark v. Luther McGill, Inc.,* 240 Miss. 509, 127 So.2d 858 (1961), the Court said:

> What gives the lent-employee cases their special character, however, is the fact that they begin, not with an unknown relation, but with an existing employment relation. The only presumption is the continuance of the general employment which is taken for granted as the beginning of any lent-employee problem. To overcome this presumption, it is not unreasonable to insist upon a clear demonstration that a new temporary employer has been substituted for the old, which demonstration should include a showing that a contract was made between the special employer and the employee, proof that the work being done was essentially that of the special employer, and proof that the special employer assumed the right to control details of the work. *Id.* at 518.

¶14. This Court in *Quick Change Oil & Lube, Inc. v. Rogers,* 663 So.2d 585 (Miss. 1995), revisited these principles and affirmed them when the Court stated:

> The general rule as applied at common law, is that a servant, in general employment of one person, who is temporarily loaned to another person to do the latter's work, becomes, for the time being, the servant of the borrower, although he remains in the general employment of the lender. The borrower then becomes the employer to the exclusion of the lender. Application of the rule depends upon the question of whose work is being performed, and if the lender is to escape liability, it must appear that the servant is under the borrower's exclusive control and directions as to the work in progress. When an employee voluntarily accepts and enters upon such an assignment, he ceases to be in the course of the employment by the lender or the general employer. However, while the "loaned servant" doctrine is generally considered applicable in the compensation field, a shift of emphasis will be noted as to three pertinent questions involved, viz: (1) whose work is being performed, (2) who controls or has the right to control the workman as to the work being performed, and (3) has the workman voluntarily accepted the special employment. *Id.* at 589 (quoting Dunn, Mississippi Workers' Compensation Law § 186 (1986)).

¶15. Thus under the loaned servant doctrine, we are guided by three important factors in analyzing whether an employment relationship exists: (1) whose work is being performed; (2) who has the right to control the worker in his duties on the job; and (3) the existence of an employment contract between the employee and the special employer whether actual or implied. *Jones v. James Reeves Contractors, Inc.,* 701 So. 2d at 780 (citing *Quick Change,* 663 So. 2d at 592, *Index Drilling Co. v. Williams,* 242 Miss. 775, 786-87,137 So. 2d 525, 529 (1962); *Clark v. Luther McGill, Inc.* 240 Miss. at 517, 127 So. 2d at 861.

¶16. *Clark v. Luther McGill,* was the case that set out this three-factor test for determining whether a worker was the loaned servant of a special master or whether that worker was an independent contractor, or the agent of the independent contractor. 701 So. 2d at 778. *Runnels v. Burdine,* 234 Miss. 272, 106 So.2d 49 (1958), discussed the facts of its case within the context of the general rule for loaned employees. *Id. Runnels* stresses the relationship between the borrower and the lender, whereas *Clark* requires that concentration be focused on the relationship between the special employer and the employee. *Id. Clark* expounded upon the loaned employee doctrine, and in so doing, reached a result more akin to those

reached by the United States Supreme Court in *Denton* and *Standard Oil Co. Id.*

¶17. This Court has been consistent in its decisions since the application of the *Clark* factors to the facts of a particular case. *Id.* at 780. The lower court analyzed all nine factors and ruled there were disputed issues of fact concerning whether Douglas was a "borrowed servant" as a matter of law. We now turn to a consideration of each of the relevant factors above and the inferences to be drawn from each factor.

¶18. It is undisputed that the work that was being done at the time of the accident was that of Patton-Tully. Douglas's purposes for being on the *John Morris* was to do some labor work; picking up plates and tearing out cabinets in the galley of the boat.

¶19. The second factor, right of control, is the determinative factor in ascertaining whether an employment relationship is that of master-servant. *Id.* at 779. The factor of control is perhaps the most universally accepted standard for establishing an employer-employee relationship, and what constitutes 'control' has been the subject of much litigation. *Ruiz,* 413 F.2d at 312. The case at bar required the court to make a careful distinction as to whether Patton-Tully was ultimately the one in control of Douglas.

¶20. The trial court found Patton-Tully had control over the work to be performed and the location of the work. However, in determining the meaning of the term"control," this Court in *Jones v. James Reeves Contractors, Inc.,* stated: "To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." 701 So. 2d at 779 (quoting *Standard Oil Co. v. Anderson,* 212 U.S. 215, 221-22, 29 S.Ct. 252, 254, 53 L.Ed. 480 (1909) (emphasis added). *See also Quick Change,* 663 So.2d at 591.

¶21. In *Clark v. Luther McGill,* 240 Miss. 509, 127 So.2d 858, 862 (1961), this Court in considering this issue also noted that:

> The ultimate right to control should not be confused with immediate control, for it is the reserved right of control rather than its actual exercise that furnishes the true test of relationship; and he is master who has the supreme choice, control and direction of the servant and whose will the servant represents in the ultimate results and in all its details, and the fact that the borrower gives information and directions to the servant as to the details of the work or the manner of doing it does not make the general servant of the employer the servant of the borrower.

¶22. The fact that Patton-Tully may have exercised immediate control over Douglas's activities on the *John Morris* should not be confused with the ultimate right of control that Cousins of B&L had over Douglas. The record shows Cousins would drive Douglas to the work site and would check on him to see if the job was being done correctly. However, Patton-Tully asserts Douglas was being directed in what his job assignments would be. Looking at the situation in its entirety, it is somewhat questionable whether Patton-Tully did have exclusive control and direction over Douglas. It is arguable that Douglas was never completely subject to Patton-Tully because Cousin kept up with the number of hours worked and could have summoned Douglas to return to B&L. Douglas was at the job site at the instructions of Cousins. Cousins testified that he maintain the right to pull Douglas off of the *John Morris* if needed elsewhere.

¶23. During cross-examination, Cousins testified he had the sole right to fire, hire, or do whatever he wanted to do, not Patton-Tully and if Patton-Tully did not like the work of his employees they could tell him and he would send someone else. In contrast, Patton-Tully claims Douglas's testimony demonstrates that control rested with Patton-Tully because Douglas testified he was under the direction of Turner, an employee of Patton-Tully at the job site.

¶24. Patton-Tully asserts the relationship was one of master-servant because Douglas submitted himself to the direction and control of Turner in the details of moving the sheets of steel plates from the *John Morris* to the deck of the adjacent dock barge. However, Douglas testified in referring to Cousins,"he took us down there and told us to work hard, to do what we were told, and we would get more work out of it." Therefore, any assistance or orders as to what to do or how to do it could be viewed as necessary to get the job done and not be of control but as information. This Court in ***Quick Change Oil & Lube, Inc., v. Rogers, Jr.,*** 663 So.2d at 591 (quoting ***[Luther McGill, Inc. v. Bradley,](674 So. 2d 11 (Miss. 1996))*** 674 So. 2d 11 (Miss. 1996)), stated: "Control has been further defined as involving a 'careful distinction. . .between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking."

¶25. It was Cousins's agreement with Anderson-Tully which caused Douglas to be on the *John Morris*. Therefore, Douglas was only doing what was expected of him. The issue of control here is obviously a disputed fact.

¶26. Even if the necessary control were present in this case, the relationship still could be insufficient to transform it into a master-servant relationship if no express or implied contract existed between Douglas and Patton-Tully. The trial court found there was no prior understanding between Patton-Tully and B&L Construction. Anderson-Tully contacted Cousins about sending workers down to *John Morris*. Cousins testified that he never entered into any agreement with Patton-Tully for the work to be done on the *John Morris*.

¶27. Also the record shows, a bill from Cousins was sent to Anderson-Tully for the work performed by Douglas. When Douglas went to the work site, he went not at his own behest, but at the behest of Cousins of B&L, in order to fulfill a request from Anderson-Tully.

¶28. In ***Clark v. Luther McGill, Inc.***, this Court insists that there be a clear showing that the employee has entered into a contract with the special employer sufficient to establish a master-servant relationship between the special employer and the employee. [701 So. 2d. at 781.](701 So. 2d. at 781.) In this case, it would appear that Douglas was not doing anything that was outside the ordinary scope of the work that an employee would normally do for B&L.

¶29. In summary, the trial court in denying summary judgment analyzed all nine factors and found there were disputed issues of fact concerning whether Douglas was a "borrowed servant" of Patton-Tully and accordingly denied the motion. Thus, Patton-Tully was not entitled to judgment as a matter of law.

¶30. Additionally, there were issues of triable fact since there was no clear showing that either an express or implied contract existed between Douglas and Patton-Tully sufficient to transform the relationship into a master-servant relationship and because the instructions which Douglas took from Patton-Tully could appear in the nature of cooperation and not subordination. The burden was also upon Patton-Tully to show Douglas was its servant. It failed to meet that burden. The ruling of the trial court is affirmed.

## II. WHETHER THE TRIAL COURT ERRED IN DENYING PATTON-TULLY'S DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT.

### Standard of Review

¶31. This Court's standards of review for a denial of a judgment notwithstanding the verdict and a directed verdict are identical. ***Sperry-New Holland v. Prestage,*** 617 So. 2d 248, 252 (Miss. 1993). Under this standard, this Court will: consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. ***Id.*** If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand, if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. ***Id.***

¶32. Patton-Tully asks that we address whether the trial court erred when it denied its motion for directed verdict and later its motion judgment notwithstanding the verdict. Patton -Tully moved to dismiss the case after Douglas rested based on two theories. First, Douglas, through his own testimony, showed he was the borrowed servant of Patton-Tully and as such, can not maintain a negligence action against Patton-Tully. Second, it is undisputed that this accident occurred, but there is no proof that Patton-Tully was negligent or contributed to Douglas's injury. The sole cause of Douglas's injuries was the inability of he and McKnight safely to put the end plate on the adjacent dock barge. Therefore, as a matter of law, Patton-Tully maintains that it is not liable to Douglas for the negligence of Douglas or McKnight or any negligence committed by any other Patton-Tully employee, including the two Patton-Tully employees that were handling the sheet of steel plate when the accident occurred.

¶33. Additionally, Patton-Tully argues it was not negligence on its part not to provide a crane for the job and if there were oil or rain on the deck, or if the boat was moving, these factors did not cause Douglas and McKnight to fail to put the plate on the dock barge. Patton-Tully alleges the accident was due to the negligence of Douglas and McKnight. Thus, Patton-Tully asserts there was no jury issue created on the issue of negligence for which this case should be submitted.

¶34. Douglas argued, due to the condition of the boat and the difficulty of the job, the instructions that were given by Turner to remove the decking was negligent. Douglas contends the duty imposed on a ship owner is to have the ship reasonably safe to work on. Reasonable steps should be employed to eliminate any dangerous conditions they knew or should have known existed. The conditions at the time of the work hampered Douglas and McKnight in their job of putting the steel plate on the barge. The condition of the boat and a Patton-Tully employee's losing his grip on the piece of steel are issues which should be resolved.

¶35. Patton-Tully countered by saying there is no duty on Patton-Tully to eliminate any of these conditions as related to Douglas. Patton-Tully is liable only for physical harm caused by conditions of its vessel if using the exercise of reasonable care it should have discovered the dangerous conditions and realized it involved unreasonable risks to the employees and secondly, if they should expect the employee will not discover or realize the danger or will fail to protect themselves. Patton-Tully claims Douglas knew of every condition before he hurt his back.

¶36. The motion for a directed verdict at the conclusion of the plaintiff's case tests the legal sufficiency of the evidence to support the verdict for the plaintiff. Miss. R. Civ. P.50(a). Upon denial of the motion for a

directed verdict at the close of all evidence, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Once a verdict is returned, the court may direct the entry of judgment as if the requested directed verdict had been granted. Miss. R. Civ. P. 50(b). Whether the court should have granted the motion here depends upon whether the evidence is insufficient as a matter of law to sustain the verdict for the plaintiff.

¶37. After deliberation of both sides of this issue, the trial court stated," the court must take as true all evidence as offered by the plaintiff to be true and any reasonable inference that can be gleamed from said evidence to be true against the non-movant...." The court went on to say that the evidence offered by the plaintiff was that the work environment as provided by Patton-Tully on the day in question was unsafe and during unsafe conditions required an object, that was heavy and cumbersome, to be lifted. Whether this is negligence on the part of Patton-Tully is a jury question.

¶38. On the issue of whether Douglas was a borrowed servant, the trial court stated, Patton-Tully had not proven as a matter of law that Douglas was a borrowed servant.

¶39. We have examined the record and looking solely at the evidence for the appellee, and all reasonable inferences which can be drawn therefrom, we find that there was, at the times the matter was considered, evidence which would support a verdict for the plaintiff, and that the case should have been submitted to the jury. We find that the circuit court was correct in denying the directed verdict at the close of the plaintiff's case and after considering the evidence supporting the verdict presented at trial we find that there did exist sufficient evidence to sustain the verdict rendered by the jury.

¶40. The court, in ruling on the motion for a judgment notwithstanding the verdict, considered the credible evidence supporting the verdict presented at trial and found that there did exist sufficient evidence to sustain the verdict rendered by the jury.

¶41. In examining the evidence in a light most favorable to Douglas and accepting all favorable evidence tending to support its case and all favorable inferences drawn therefrom as true, reasonable and fairminded jurors could have reached the same conclusions. As such, the jury verdict should be allowed to stand and the denial of Patton-Tully's motions affirmed.

### III. WHETHER THE TRIAL COURT MADE ERRONEOUS EVIDENTIARY FINDINGS AND IMPROPERLY INSTRUCTED THE JURY.

¶42. Additionally, Patton-Tully contends the circuit court erred in making numerous erroneous evidentiary rulings and gave a jury instruction which incorrectly stated applicable law. The jury instruction in question stated:

> A vessel operator, such as the defendant, should exercise reasonable care before the plaintiff begins his work on a vessel, the MV John Morris. This means the defendant must use reasonable care to have the vessel and its equipment in such condition that an expert and experienced iron worker, such as the plaintiff, would be able, by the exercise of reasonable care, to carry on his work on the vessel with reasonable safety to persons and property. This means that the **defendant must warn the plaintiff of a hazard on the ship, or a hazard with respect to the ship's equipment**, if: the defendant knew about the hazard, or should have discovered it in the exercise of reasonable care, and the hazard was one which was likely to be encountered by the plaintiff in the course of his work in

connection with the defendant's vessel, and the hazard was one which the plaintiff did not know about which would not be obvious to anticipated by a reasonably competent iron worker in the performance of his work. Even if the hazard was one about which the plaintiff knew, or which, would be obvious or anticipated by a reasonably competent iron worker, the defendant must exercise reasonable care to avoid the harm to plaintiff if the hazard was one which defendant knew or should have known the plaintiff would not or could not correct and the plaintiff could not or would not avoid.

Therefore, if you believe by a preponderance of the evidence that the defendant was negligent in failing to provide a reasonably safe place to work, **in that it failed to provide sufficient manpower and equipment to remove the steel plates when the deck was slippery with oil and water...**

(emphasis added).

¶43. Patton-Tully asserts that this jury instruction not only improperly instructed on 33 U.S.C. § 905(b) negligence but also that the instruction lacked evidentiary basis in that no evidence was introduced which tended to show the decks were "slippery with oil and water" or that its manpower or equipment was insufficient. It is contended this jury instruction constituted a finding of fact by the trial court with respect to a factual issue that was disputed. Patton-Tully contends that if there were "hazards" that existed, they played no part in the injury and Patton-Tully had no duty to warn Douglas of so called "hazards" that he was aware existed.

¶44. Here, the extent of a vessel's duty to longshoremen under 33 U.S.C. § 905 (b) must be determined. The longshoreman's right to recover for negligence was preserved by section 905(b), but the section did not specify what acts or omissions would constitute actionable negligence. ***Pluyer v. Mitsui O.S.K. Lines, Ltd.,*** 664 F.2d 1243, 1246 (5TH Cir.1982). Neither can it be said that the legislative history, which has been analyzed and re-analyzed in the course of these cases, furnishes sure guidance for construing § 905 (b). ***[Scindia Steam Navigation Co. v. Santos](), 451 U.S. 156, 165, 101 S.Ct. 1614, 1621, 68 L.Ed.2d 1 (1981)***. However, in ***[Scindia Steam Navigation Co.](),*** the Court mandated use of a " 'reasonable care under the circumstances of each case' " test and then went on the discuss the various inquiries essential to proper resolution of a longshoreman's negligence action against a vessel. ***McCullough v. S/S Coppename***, 648 F.2d 1036, 1038 (5th Cir. 1981). The Court held:

the vessel owes to the stevedore and his longshoremen employees the duty of exercising due care "under the circumstances." This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work. The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman.

***[Scindia Steam Navigation Co. v. Santos](), 451 U.S. at 165.***

¶45. As a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards. *Id.* at169.

¶46. Section 41 of the Act, 33 U.S.C. § 941, requires the stevedore to provide a "reasonably safe" place to work and to take such safeguards with respect to equipment and working conditions as the Secretary of Labor may determine to be necessary to avoid injury to longshoremen.[1] *Id*.

¶47. It is error to grant a jury instruction that misstates the law applicable to a case. *Munford, Inc. v. Fleming,* 597 So. 2d 1282, 1286 (Miss. 1992). Further, when this Court reviews the propriety of a jury instructions, it will view the questioned instruction in light of all other instructions which were given to determine whether the jury was correctly instructed. *Id.* at 1286.

¶48. In the case sub judice, the circuit court also gave instructions which stated:

> You are instructed that a vessel owner is not negligent simply because a worker, working aboard such vessel, is accidentally injured. Patton-Tully was not obligated to furnish an accident-free vessel to Jamey Douglas. Patton-Tully's only duty was to furnish a vessel that was reasonably safe for competent, careful workers to work aboard her.

> If you find from a preponderance of the evidence that the M/V John Morris, together with Patton-Tully's workers who worked with Jamey Douglas, were reasonably safe, then Patton-Tully was not negligent and this is true even though you may also find that Jamey Douglas got hurt while working on that vessel.

¶49. Therefore, in viewing all of the instructions given, we find the circuit court adequately informed the jury as to the law applicable to the case sub judice.

¶50. Patton-Tully had a duty to have the ship and its equipment in such condition that the stevedore, Buddy Turner, may carry on its cargo operations with reasonable safety and the stevedore's duties is to provide a safe workplace and to use safeguards with respect to the ship's gear.

¶51. Patton-Tully's assertion that the trial court made a finding of fact in regard to the deck being "slippery with oil and water" is totally out of context. Douglas testified that the back of the boat was wet with rain and hydraulic oil. "We were stepping over all this stuff in that hydraulic oil." "The floor was pretty wet and we were having to get down here and put that decking up on that barge." Further, McKnight stated, " It was raining off and on. And it was kind of wet and slick." "It was oily and slick. All the steering inside the steering was oil and where we step in side and out on the wall it was just slick." Therefore, evidence was introduced to support the instruction going to the jury on finding such issues by a preponderance of the evidence.

## CONCLUSION

¶52. We conclude that the trial court properly (1) denied the motion to rule as a matter of law that Douglas was a borrowed servant, and (2) denied the directed verdict and judgment notwithstanding the verdict, and (3) properly instructed the jury.

¶53. The burden was upon Patton-Tully to show that Douglas was its servant. There was an issue of material fact which prevented the trial court from granting summary judgment. We cannot say there was

insufficient evidence introduced for the jury to have reasonably concluded the deck was slippery with oil and water or that its manpower or equipment was insufficient. The verdict of the jury was supported by the weight of the evidence presented.

¶54. Further, the jury instructions accurately stated the law as to the duty of a vessel owner, and the instructions had an evidentiary basis. Accordingly, the judgment of the circuit court is affirmed.

¶55. **AFFIRMED.**

>**PRATHER, C.J., PITTMAN AND BANKS, P.JJ., McRAE, MILLS, WALLER AND COBB, JJ., CONCUR. DIAZ, J., NOT PARTICIPATING.**

1. 33 U.S.C. § 941 provides in relevant part as follows: "(a)...Every employer shall furnish and maintain employment and places of employment which shall be reasonably safe for his employees in all employments covered by this chapter and shall install, furnish, maintain, and use such devices and safeguards with particular reference to equipment used by and working conditions established by such employers as the Secretary may determine by regulations or order to be reasonably necessary to protect the life, health, and safety of such employees, and to render safe such employment and places of employment, and to prevent injury to his employees."