Katie BANKS, Administratrix of the Estate of Yolanda Ann Banks, Deceased, on Behalf of the Wrongful Death Beneficiaries of Yolanda Ann Banks, Deceased, and all Others Who are Entitled to Recover Under the Wrongful Death Statute and on Behalf of the Estate of Yolanda Banks, Deceased, Plaintiffs

v.

UNITED STATES of America, Defendant.

Civil Action No. 3:08CV65TSL–JCS.

United States District Court,
S.D. Mississippi,
Jackson Division.

April 29, 2009.

Gerald P. Collier, Larry Stamps, Stamps & Stamps, Jackson, MS, for Plaintiffs.

Angela D. Givens, Mitzi Dease Paige, U.S. Attorney's Office, Jackson, MS, for Defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendant United States of America for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Katie Banks, Administratrix of the Estate of Yolanda Ann Banks, deceased, on behalf of the wrongful death beneficiaries of Yolanda Ann Banks, deceased, has responded to the motion and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that the Government's motion is well taken and should be granted.

Yolanda Banks, a patient of the University of Mississippi Medical Center High Risk Obstetrics Clinic, died on March 23, 2004, from a post-operative intra-abdominal abscess. On February 1, 2009, plaintiffs filed this lawsuit, charging that Ms. Banks' death was due to the negligence of Dr. Andrew T. Allen in failing to order appropriate diagnostic tests and his consequent failure to properly diagnose and treat Ms. Banks. At the time of the events at issue, Dr. Allen was a Captain in the United States Navy and hence an employee of the United States. *See* 28 U.S.C. § 2671 (providing that members of the military are "employees" of the federal government). Accordingly, plaintiff brought this medical malpractice action against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), 2671–2680, asserting the Government is vicariously liable for Dr. Allen's alleged negligence. The Government has moved for summary judgment, contending that it cannot be held vicariously liable for Dr. Allen's alleged negligence since at the time of his actions in diagnosing and treating Ms. Banks, Dr. Allen was the "borrowed servant" of UMMC.[1]

Under the FTCA, the United States is liable for the torts of its employees to the same extent as a private party would be under like circumstances, according to state law. 28 U.S.C. § 2671, *et seq.; Starnes v. United States,* 139 F.3d 540, 542 (5th Cir.1998). Where the FTCA applies, the United States can assert the same defenses available to private citizens, including the "borrowed servant" defense. *Palmer v. Flaggman,* 93 F.3d 196, 199 (5th Cir.1996). Mississippi law recognizes the defense of the "borrowed servant" where a person who is under the employment of

---

1. The court rejects plaintiff's argument that the Government waived the "borrowed servant" defense by failing to promptly move for summary judgment on the basis of this defense. The Government raised the defense in its answer and filed its motion for summary judgment according to the deadline imposed by the case management order, following discovery which addressed, *inter alia,* the factual basis for its defense.

753

one employer may be temporarily loaned to another employer, in which circumstance "[t]he borrower ... becomes the employer to the exclusion of the lender." *Quick Change Oil & Lube, Inc. v. Rogers,* 663 So.2d 585, 592 (Miss.1995).

■ The Mississippi Supreme Court described the borrowed servant doctrine in *Quick Change Oil & Lube,* stating,

> The general rule as applied at common law, is that a servant, in general employment of one person, who is temporarily loaned to another person to do the latter's work, becomes, for the time being, the servant of the borrower, although he remains in the general employment of the lender. The borrower then becomes the employer to the exclusion of the lender. Application of the rule depends upon the question of whose work is being performed, and if the lender is to escape liability, it must appear that the servant is under the borrower's exclusive control and directions as to the work in progress. When an employee voluntarily accepts and enters upon such an assignment, he ceases to be in the course of the employment by the lender or the general employer. However, while the "loaned servant" doctrine is generally considered applicable in the compensation field, a shift of emphasis will be noted as to three pertinent questions involved, viz: (1) whose work is being performed, (2) who controls or has the right to control the workman as to the work being performed, and (3) has the workman voluntarily accepted the special employment.

*Id.* (quoting Dunn, *Mississippi Workers' Compensation Law* § 186 (1986)). Thus, under Mississippi law, three factors are analyzed in deciding whether the doctrine applies: "(1) whose work is being performed; (2) who has the right to control the worker in his duties on the job; and

(3) the existence of an employment contract between the employee and the special employer whether actual or implied." *Patton–Tully Transp. Co. v. Douglas,* 761 So.2d 835, 839 (Miss.2000).

■ The record evidence in this case establishes beyond reasonable challenge that Dr. Allen was UMMC's borrowed servant in connection with his residency at UMMC, and his diagnosis and treatment of Yolanda Banks during that residency. It is undisputed that in February 2004, the time of the events at issue in this lawsuit, Dr. Allen was a Captain in the Air Force in his second year of a residency training program between the Air Force and UMMC, and was assigned to a two-month rotation in the UMMC High Risk Obstetrics Clinic. The parameters of the training program were set forth by a 2003 Memorandum of Understanding (MOU) entered between UMMC and the Keesler Medical Center, Keesler Air Force Base.

The MOU recites at the outset that "during the period of assignment, primary emphasis continually rests with OB/GYN cases in the University and under the supervision of the teaching staff in this specialty." It further provides that "[w]hile training at the University, the Air Force residents will be under the jurisdiction of the Chief of OB/GYN and the teaching staff of the University who are qualified and have expressed an interest in this program." The Agreement grants UMMC the right to refuse acceptance of any resident or to bar a resident from further participation when it determines that such participation would not be in the best interest of UMMC.

The MOU sets forth the resident's duties with regard to all facets of his training, including his required attendance at and participation in departmental meetings and surgical clinics; his responsibilities regarding record-keeping and reporting of

his training activities; and the nature of patient care expected of him, including the requirement that he "abide by all hospital, state, and federal rules and regulations regarding patient care and ... seek advice in questionable circumstances." The Agreement imposes on UMMC corresponding obligations, among others, to make available the clinical and related facilities needed for training; to arrange schedules that will not conflict with other education programs; to provide reasonable classroom, conference, office, storage, dressing and locker room space for participating residents and their faculty or staff supervisors; and to "[d]esignate an official" with "authority for the day-to-day operations of [the resident's] rotation at the University" who has responsibility "to coordinate and supervise the Air Force trainee's clinical learning experience during the trainee's rotation," including "planning with the University's faculty or professional staff for the assignment of Air Force trainees to specific clinical cases and experiences, including his attendance at selected conferences, clinics, courses, and programs conducted under the direction of the University."

In addition to the MOU itself, the Government has presented the affidavit of Dr. Shirley Schlessinger, Associate Dean for Graduate Medical Education and Designated Institutional Official for UMMC, in which she addresses the terms of the MOU and further explains the residency program. In her affidavit, Dr. Schlessinger explains that once an Air Force physician such as Dr. Allen starts his OB/GYN training at UMMC, he remains on active duty and continues to receive his military pay, but he is otherwise removed from the Air Force Service environment. The Air Force has no input or control over the details of patient care rendered, or of medical tasks performed by OB/GYN trainees at their respective clinical facility assignments, which are determined instead solely by UMMC. Dr. Schlessinger declares that all patient care rendered or medical tasks performed by residents is done "under the supervision, direction, and control of the teaching staff" of UMMC, and thus. Dr. Allen, at all relevant times, "was acting under the supervision, direction and control of UMMC."

Finally, Dr. Allen has testified that during his rotation at UMMC for high-risk obstetrics, he had no contact at all with the Air Force and was completely under the jurisdiction of UMMC, subject to the "chain of command of the University from the attending physicians to the chief resident down to" him. UMMC controlled what patients he saw and when he saw them; UMMC had ultimate control over what he did with the patients in terms of care provided; and he was under the immediate professional supervision and control of a member of the UMMC faculty or staff.

In light of the referenced evidence, which plaintiff has not challenged, this case is not distinguishable in any pertinent respect from *McBee v. United States*, 101 Fed.Appx. 5, 6 (5th Cir.2004), in which the Fifth Circuit affirmed the district court's holding that Dr. Timothy Porea, an active member of the United States Navy who was participating in a fellowship program at Baylor College of Medicine was the "borrowed servant" of Baylor for vicarious liability purposes. As described by the district court in *McBee*, the MOU between Baylor and the Navy contained the same pertinent provisions as the MOU between the Air Force and UMMC. *See McBee v. Untied States*, Civ. Action No. SA–02–CA–1040–XR (W.D.Tex. Oct. 1, 2003). That MOU recited that participating physicians would be "under the supervision of facility officials for training purposes," slip op. at 5, and would be "subject to and ... re-

quired to abide by all facility rules and applicable regulations," *id.* at 6. Dr. Porea was paid by the Navy, but Baylor could bill for his services. *Id.* Baylor, like UMMC, was required to designate an official to coordinate the physician's learning experiences, and had the right to discharge a physician from the program. *Id.* at 6–7. There was further evidence in the form of affidavits from those responsible for overseeing the program that the Navy had no control over the details of the medical tasks performed by the fellows in the program, and that all direct patient care rendered by program participants was under the direction of the teaching staff of Baylor. *Id.* at 7. Notwithstanding this evidence, the plaintiffs in *McBee* argued that the Government had failed to conclusively establish that Dr. Porea was a "borrowed servant" of Baylor since the evidence showed that he was an employee of, and was paid by the Navy, and since Dr. Porea, as a licensed physician, made independent medical decisions not subject to active control by Baylor and was allowed to perform examinations work-ups, and to order tests on patients without involvement of Baylor staff. *Id.* at 9–10. They acknowledged that the MOU stated that program participants would be "supervised" by Baylor "faculty officials," but they argued that this general statement said nothing about the degree of care Baylor exercised over Dr. Porea's patient care. *Id.* at 10. The court rejected all plaintiffs' arguments, and found that the evidence—which is virtually the same in content as that presented here—conclusively established that Baylor had the right to control Dr. Porea's work at the time of the alleged negligence and that he was Baylor's borrowed servant. *Id.* at 14.

In so holding, the district court and the Fifth Circuit in *McBee* distinguished the facts presented from an earlier Fifth Circuit opinion, *Starnes v. United States*, 139 F.3d 540 (5th Cir.1998), in which the court reversed a lower court's grant of summary judgment for the Government on the issue of borrowed servant. As in *McBee* and the case at bar, *Starnes* involved an active member of the United States Army who was participating in a residency training program at a private hospital pursuant to a training agreement between the Army and the hospital. However, the Fifth Circuit concluded that resident was not a borrowed servant because the training agreement placed the resident under the control of a teaching chief, an independent contractor, and not the hospital; because the agreement made the resident responsible for patient care, charged with the "workup, evaluation, and management of patients assigned to him/her by members of the Training Institution staff"; and because the agreement provided that the United States was liable for the negligent acts of its employees and that it was "liable for the negligence of residents during the training period covered in the Agreement." Thus, in light of "the lack of an express provision indicating that [the hospital] had control over [the resident's] patient care, the provisions of the Agreement which did indicate that the United States accepted liability for the negligence of its employees undergoing training, and the absence of Texas case law applying the borrowed servant doctrine to physicians," the court concluded the borrowed servant doctrine did not apply. *Id.* at 543.

As did the plaintiffs in *McBee*, plaintiff herein relies on *Starnes* for his argument that Dr. Allen was not UMMC's borrowed servant. However, as the Fifth Circuit observed in *McBee*, "*Starnes* is factually distinguishable" from this case, for here, the MOU and other uncontroverted evidence establishes that Dr. Allen was di-

rectly supervised by UMMC staff physicians, not by independent contractors. Moreover, the United States did not accept liability for residents' negligence in the Air Force/UMMC MOU, in contrast to the training agreement in *Starnes.*[2]

Whereas the right of control is the sole dispositive factor in the "borrowed servant" analysis under Texas law, applied by the court in *McBee,* Mississippi law takes into account not only who has the right to control the worker in his duties, but also whose work is being performed, and "the existence of an employment contract between the employee and the special employer whether actual or implied." Those factors also support the conclusion that Dr. Allen was a borrowed servant. While assigned to UMMC, he was performing the work of UMMC, which was billing patients for his services; and, his work was performed under the terms of the agreement between the Air Force and UMMC, which defined and controlled his relationship with UMMC.

For all of the foregoing reasons, the court concludes that the United States is entitled to summary judgment, and its motion is therefore granted.

2. The court acknowledges plaintiff's argument that Paragraph 10 of the MOU demonstrates that the United States has accepted liability for the negligent acts and/or omissions of Dr. Allen while acting within the scope of his duties pursuant to the MOU. That provision states,

    While assigned to the University and performing services pursuant to this agreement, the Air Force residents remain employees of the United States performing duties within the course and scope of their federal employment. Consequently, the provisions of the Federal Tort Claims Act (Title 28, U.S.C., Section 134(b), 2671–2680) including its defenses and immunities, will apply to allegations of negligence or wrongful acts or omissions by the Air

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

Force residents while acting within the scope of their duties pursuant to this agreement.

However, as the district court correctly observed in *McBee,* in contrast to the agreement in *Starnes,* this provision does not state that the United States "is liable" for the employee's negligence. Moreover, the Fifth Circuit held in *Palmer v. Flaggman,* 93 F.3d 196, 199 (5th Cir.1996), a federal employee may be a "borrowed servant" and still be acting within the course and scope of his federal employment for purposes of immunity. *See also McBee,* 101 Fed.Appx. 5, 6 (5th Cir.2004) (recognizing that "that the applicability of the FTCA does not render the Government automatically liable").